# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TERRENCE ZEHRER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14 C 00789 |
| v. | ) | |
| | ) | Consolidated |
| HARBOR CAPITAL ADVISORS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| RUTH TUMPOWSKY, | ) | |
| | ) | Case No. 14 C 07210 |
| Plaintiff, | ) | |
| | ) | Judge Joan H. Lefkow |
| v. | ) | |
| | ) | |
| HARBOR CAPITAL ADVISORS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Terrence Zehrer and Ruth Tumpowsky each filed lawsuits, consolidated here, against

Harbor Capital Advisors, Inc. (Harbor) alleging violations of § 36(b) of the Investment Company

Act of 1940, 15 U.S.C. §80a-35(b) (the ICA).[1] Harbor moves for summary judgment. (Dkt.

162.)[2] For the reasons stated below, the motion is granted.

---

[1] The court's jurisdiction rests on 15 U.S.C. § 80a-35(b)(5) and 28 U.S.C. § 1331. Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391.

[2] All docket numbers referred to herein refer to the docket for *Zehrer* v. *Harbor Capital Advisors, Inc.*, No. 14 C 789 (N.D. Ill. filed Feb. 4, 2014).

Plaintiffs are shareholders in two mutual funds, the Harbor International Fund (HIF) and the Harbor High Yield Bond Fund (HBF) (the Funds). Their claims are derivative in nature and center on the fees charged by Harbor to manage the Funds.

## I.    The Funds

As succinctly explained in *Jones* v. *Harris Assocs. L.P.*, 559 U.S. 335, 338, 130 S. Ct. 1418, 1422 (2010) (citation omitted),

> A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund. The following arrangements are typical. A separate entity called an investment adviser creates the mutual fund, which may have no employees of its own. The adviser selects the fund's directors, manages the fund's investments, and provides other services. Because of the relationship between a mutual fund and its investment adviser, the fund often cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.

The ICA created protections for shareholders of mutual funds, in part, by imposing a fiduciary duty on a fund's adviser with respect to the compensation it receives. *Id.* at 338–39.

HIF and HBF are part of the Harbor Funds, an investment company registered under and subject to the ICA. As described above, Harbor created the Funds and acts as the investment adviser for both pursuant to investment advisory agreements (IAAs).

---

[3] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to the non-moving party. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted. Harbor's Rule 56.1(a)(3) statements of fact are cited as DSOF, plaintiffs' responding LR 56.1(b)(3)(B) statements as PSOF, and plaintiff's LR 56.1(b)(3)(C) statements of additional fact as PSOAF.

## II.    The IAAs

The IAAs outline the services that Harbor provides to the Funds, including both

investment advisory services and administrative services.[4] (PSOF ¶¶ 12–14, 19.) The IAAs

---

[4] As neither party indicates that the operative language of the IAAs varied from year to year, the court considers the 2013 IAAs to be representative. Harbor has three key advisory responsibilities, including to

> (1) "regularly provide the Fund with investment research, advice and supervision and … furnish continuously an investment program for the Fund consistent with the investment objectives and policies of the Fund";
>
> (2) "determine what securities and other financial instruments shall be purchased for the Fund, what securities and other financial instruments shall be held or sold by the Fund, and what portion of the Fund's assets shall be held uninvested"; and
>
> (3) "advise and assist the officers of the Trust in taking such steps as are necessary or appropriate to carry out the decisions of the Trustees and the appropriate committees of the Trustees regarding the conduct of the business of the Trust insofar as it relates to the Fund."

(Dkt. 166-14 (2013 HIF IAA) ¶ 3; Dkt 166-15 (2013 HBF IAA) ¶ 3.)  The IAAs require these

administrative services:

> (1) assist in supervising all aspects of the Fund's operation including "coordinat[ing] and oversee[ing]" (a) "the services provided by the Trust's transfer agent, custodian, legal counsel and independent auditors," (b) "the preparation and production of meeting materials for the Trustees," and (c) "the preparation and filing with the U.S. Securities and Exchange Commission ('SEC') of registration statements, notices, shareholder reports, proxy statements and other material for the Fund";
>
> (2) provide the Trust with officers and employees necessary to administer the affairs the Trust;
>
> (3) "develop and implement procedures for monitoring compliance with the Fund's investment objectives, policies and guidelines and with applicable regulatory requirements";
>
> (4) "provide legal and regulatory support for the Fund in connection with the administration of the affairs of the Trust"; and
>
> (5) "furnish to the Fund such other administrative services as you deem necessary, or the Trustees reasonably request, for the efficient operation of the Trust and Fund."

permit Harbor to engage subadvisers, subject to approval by the Board, to provide investment advisory services.[5] (2013 HIF IAA ¶ 4; 2013 HBF IAA ¶ 4.) The IAAs provide that Harbor, not the Funds, will pay any subadviser. (2013 HIF IAA ¶ 6(b); 2013 HBF IAA ¶ 6(b).)

## III.    The Subadvisers

Harbor has retained subadvisers for both HIF and HBF, creating what it calls a "manager of managers" structure. (PSOF ¶ 20.) Northern Cross, LLC (Northern Cross) is the subadviser for HIF, and Shenkman Capital Management (Shenkman) is the subadviser for HBF. (*Id.* ¶ 21.) The subadvisers make "the day-to-day investment decisions" for their Funds, albeit contractually subject to Harbor's oversight. (*See* 2013 HIF IAA ¶ 4; 2013 HBF IAA ¶ 4.)[6]

---

(2013 HIF IAA ¶ 3; 2013 HBF IAA ¶ 3.)

[5] The IAA provides,

> You may engage one or more investment advisers … to act as subadvisers ….Subject always to the discretion and control of the Trustees, you will monitor and oversee each subadviser's management of the Fund's investment operations in accordance with the investment objectives and related investment policies of the Fund, as set forth in the Trust's registration statement with the SEC, and review and report to the Trustees periodically on the performance of such subadviser.

(2013 HIF IAA ¶ 4; 2013 HBF IAA ¶ 4.)

[6] As with the IAA, the court considers the 2013 subadviser IAAs to be representative. In their respective agreements with Harbor, Northern Cross and Shenkman agreed to perform the following duties for HIF and HBF:

> (1) provide the Fund with advice concerning the investment management of that portion of the Fund's assets that are allocated to you … consistent with the investment objectives and policies of the Fund;

> (2) determine what securities shall be purchased for such portion of the Fund's assets, what securities shall be held or sold by such portions of the Fund's assets, and what portion of such assets shall be held uninvested, subject … to the investment objectives, policies and restrictions of the Fund;

> (3) arrange for the placing of all orders for the purchase and sale of

Despite the breadth of duties performed by the subadvisers, Harbor asserts that it retains a number of responsibilities under the IAAs including, among others, "establishing, and [ ] recommending changes to, the investment policies strategies and guidelines for each Fund," and "overseeing the subadviser to each Fund, including recommending for Board consideration the selection, termination and replacement of subadvisers." (Dkt. 173 at 26.) Plaintiffs do not dispute that the services provided by Harbor are consistent with the IAAs and of at least "reasonably good quality." (Dkt. 167-17, Deposition of Richard W. Kopke (Kopke Dep.) at 132:6–11.)

## IV. The Fees

Plaintiffs object to the amount of fees the Funds pay to Harbor. For its services, Harbor receives a management fee from the Funds based on the average daily net asset value of each Fund. Harbor pays the subadviser's fees from the fees it receives from the Funds. The fee agreement for HIF includes "breakpoints," which decrease the percentage fee that Harbor collects as the levels of assets under management increase. Some of the breakpoints are included in the IAAs; others are the result of contractual fee waivers. The breakpoints are marginal, *i.e.*, the fee reduction applies to all assets above the breakpoint. The theory behind the inclusion of breakpoints is that economies of scale should benefit the Fund rather than Harbor. The management fee, with breakpoints, paid by HIF is summarized in the table:

---

portfolio securities;

(4) maintain written compliance policies and procedures that you reasonably believe are adequate to ensure the Fund's compliance with the [ICA and other regulations]; and

(5) keep the Fund's books and records to be maintained by you.

(Dkt. 166-26 (2013 HIF Subadviser IAA) ¶ 2; Dkt. 166-27 (2013 HHYBF Subadviser IAA) ¶ 2).

| Assets under management | Fee paid on these assets |
|---|---|
| Up to $12 billion | 0.75% (75 basis points (bps)) |
| $12 to $24 billion | 0.65% (65 bps) |
| $24 to $36 billion | 0.63% (63 bps) |
| $36 to $48 billion | 0.58% (58 bps) |
| Over $48 billion | 0.57% (57 bps) |

HBF, on the other hand, pays a flat rate (0.60% or 60 bps) under its IAA, which has been reduced to 0.56% (56 bps) as a result of a contractual fee waiver. Like Harbor's fee arrangement with HIF, the fees of the subadviser for HBF are structured in tiers but the rates are lower than those paid by HIF. For example, Northern Cross's fee ranges from 0.55% on the first $1 billion under management down to 0.30% for assets under management over $36 billion, while Shenkman's fee starts at 0.40% on the first $25 million under management and decreases to 0.30% for assets under management over $100 million. (*See* 2013 HIF Subadviser IAA, Schedule A; 2013 HBF Subadviser IAA, Schedule A.) The tables below summarize Harbor's gross advisory fee and the subadviser fee for each Fund in 2011, 2012, 2013, and 2014. (Harbor retained approximately 45 percent of HIF's fee each year and 46-47 percent of HBF's fee, which amounts would include other services as well as its profits.)

**HIF**

| | 2011[7] | 2012[8] | 2013[9] | 2014[10] |
|---|---|---|---|---|
| **Advisory fee** | $223,094,000 | $233,768,000 | $290,726,000 | $327,489,000 |
| **Subadviser fee** | $123,582,000 | $129,313,000 | $159,209,000 | $178,270,000 |

---

[7] (Dkt. 166-94 at 0005249.)

[8] (Dkt. 166-30 at 0010027.)

[9] (Dkt. 166-31 at 0015386.)

[10] (Dkt. 166-6 at 0022128.)

**HBF**

| | 2011[11] | 2012[12] | 2013[13] | 2014[14] |
|---|---|---|---|---|
| **Advisory fee** | $9,514,000 | $12,453,000 | $12,476,000 | $10,133,000 |
| **Subadviser fee** | $5,071,000 | $6,712,000 | $6,744,000 | $5,488,000 |

## V.    Board Approval of the Fees

The Board of Trustees of the Funds (the Board) is responsible for overseeing the affairs

of the Trust. Harbor's IAAs with the Funds are reviewed and approved by the Board every year.

(PSOF ¶ 12.) The subadviser IAAs are also Board-approved. (*Id.* ¶ 36.)

Between 2012 and 2015, at least six Trustees comprised the Board. Only one trustee was

an "interested person" as the term is defined in § 2(a)(19) of the ICA. *See* 15 U.S.C. § 80a-

2(a)(19); (PSOF ¶ 31). Plaintiffs do not contest the qualifications of the Board's members, nor do

they dispute that the Board meets the statutory requirements regarding how many of its members

must be disinterested persons. (*Id.*) The Board has independent counsel from the investment

management practice of Dechert LLP, a "nationally recognized … leader in advising mutual

fund boards." (*Id.* ¶ 35.) In particular, Dechert advises the independent trustees regarding the

legal standards applicable to, and what information should be considered in connection with, the

annual review and approval of the IAAs required by the ICA (also known as the "15(c) review"

for the section of the ICA containing the requirement). (*Id.* ¶ 37.)

The Board meets twice quarterly, typically holding three-hour telephonic meetings,

followed a week-to-ten days later by in-person meetings that typically last two days. (*Id.* ¶ 33.)

---

[11] (Dkt. 166-94 at 0005250.)

[12] (Dkt. 166-30 HCA0010028.)

[13] (Dkt. 166-31 HCA0015387.)

[14] (Dkt. 166-6 HCA0022129.)

The IAAs and subadviser IAAs are discussed and approved at the Board's February meeting. (*Id.* ¶ 36.) The February telephone meeting is used to give the independent trustees an opportunity to convene with representatives from Dechert and preview the questions and issues that the independent trustees plan to discuss at the in-person meeting. (*Id.* ¶ 62.) There is some dispute between the parties regarding the Board's preparation and diligence. Harbor's lead independent trustee, Rodger Smith, testified that "it's a very interactive group. Everybody talks. Everybody owns the responsibility." (Dkt. 167-5, Deposition of Rodger Smith (Smith Dep.) at 153:9–11.) Likewise, another independent trustee, Raymond Ball, testified, "I was told Harbor is known as a board that is very active and gets very involved and you don't miss board meetings and you come prepared and do your homework.…" (Dkt. 167, Deposition of Raymond J. Ball (Ball Dep.) at 64:18–65:1.) Plaintiffs point to evidence that thousands of pages are posted shortly before the telephonic meeting, and at the meetings some trustees concede that they have not read them page by page. (Dkt. 225, Plaintiffs' Amended Response to DSOF ¶¶ 62, 63(a).)

In advance of the 15(c) review meeting in February, Dechert makes a written request to Harbor for information pertinent to what are known as *Gartenberg* factors (so named for the case that first elucidated them, *Gartenberg* v. *Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982)), as well as any other matters relevant to the trustees' 15(c) review process. (PSOF ¶ 38.) In response to the request, Harbor provides a large amount of information for the Board to review, including information about the nature and quality of the various services provided by Harbor and the subadvisers, including investment, administrative, and oversight services. (*Id.* ¶ 40.) Much of these "nature and quality" materials are prepared by Harbor and the subadvisers (*see, e.g.*, *id.* ¶ 41), but there are also reports from independent financial services firms, Lipper, Inc., and Morningstar. (*Id.* ¶ 42.)

The Lipper reports evaluate the comparative fees paid by similar funds to their advisers and compare the Funds' performance for the previous year against benchmarks and competitors. (*See id.* ¶¶ 42–44, 45–46, 48.) It also reports the profits Harbor realizes from the Funds. (*Id.* ¶ 50.) Harbor's profits are reported to the Board in two ways: a gross profitability analysis on a fund-by-fund basis, wherein Harbor's Fund-specific expenses, including subadviser fees, are deducted from Harbor's Fund-specific revenues; and a Modified Profitability Analysis on an enterprise-level basis, wherein Harbor's profits are calculated with subadviser fees excluded, *i.e.* the subadviser fees are not treated as either revenue or an expense, and profitability is determined using only the advisory fee portion that doesn't go to the subadvisers and Harbor's internal operating expenses. (*Id.* ¶ 51, 56.) The profitability materials contain all the information necessary for the calculation of the modified profitability on a fund-by-fund basis as well. (*Id.* ¶ 54.) Finally, Harbor provides information concerning whether Harbor realizes any economies of scale in providing services to the Funds and whether Harbor receives fall-out benefits as a result of its relationship to the Funds. (*Id.* ¶ 60.)

The in-person 15(c) review meetings follow from year-to-year the same general agenda, which schedules the first day to be devoted to reviewing the 15(c) review materials and hearing presentations from Harbor representatives on the nature and quality of services received, comparative fee structures, and Harbor's profitability. (*Id.* ¶ 64.) The second and, if needed, third days are for presentations by the subadvisers and allow time for the trustees to vote on whether to approve all the service agreements before them. (*Id.*) When deciding whether to approve the IAAs, the Board considers many factors. As the lead independent trustee testified, "[W]e look at the quality of services that they're providing. We look[] at the performance record of each of the subadvisors. We look at the advisory fee relative to other funds of the same size or type. We look

at the subadvisory fee and then we look at the level of profitability. If all those metrics are reasonable and the quality of service is above average . . .we'll approve" the fee. (Dkt. 184-8, Smith Dep. at 94:13–23.)

The Board has at least once negotiated more favorable breakpoints than Harbor proposed. In 2008, for example, the Board requested that Harbor agree to additional breakpoints for HIF. (PSOF ¶ 69.) After approximately six months of negotiations, which one trustee described as "quite a battle" (dkt. 167-11, Deposition of Howard P. Colhoun (Colhoun Dep.) at 196:4), Harbor accepted a two basis point reduction at the $24 billion and $36 billion asset levels rather than the one basis point reduction Harbor sought. (PSOF ¶ 70.)

Plaintiffs argue that the Board in general does not actively negotiate fees but passively approves them year after year, that in 2014 failed to apply adjustments to fee schedules, and that Harbor relies only on meeting minutes as evidence of whether and to what extent the trustees actually reviewed, considered, or deliberated on the materials submitted to them. In all events, plaintiffs deny that the benefits of economies of scale are shared equitably with investors. (PSOF ¶ 68).

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law …." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party." *Id.* To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions,

answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court does not, however, have to "draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le-Isreal, B.M.* v. *Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, "a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Day* v. *N. Ind. Pub. Serv. Co.*, 987 F. Supp. 1105, 1109 (N.D. Ind. 1997); *see also Insolia* v. *Philip Morris, Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). "[G]uesswork and speculation are not enough to avoid summary judgment." *Good* v. *Univ. of Chi. Med. Center*, 673 F.3d 670, 675 (7th Cir. 2012), *overruled on other grounds by Ortiz* v. *Werner Enter., Inc.*, 834 F.3d 760 (7th Cir. 2016). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## ANALYSIS

Plaintiffs contend that Harbor has violated § 36(b) of the ICA. Their theory of liability, "[p]ut simply," is that the revenue Harbor collects from the Funds compared to the costs it incurs for the services it purportedly provides is so disproportionately large that its fees bear no reasonable relationship to the services rendered and could not have been the product of arm's

length negotiations. Pl. Mem. at 1. At all events, they contend that their claims should not be decided on summary judgment where the ultimate issue is one of fact.

## I.    Section 36(b) of the ICA

Section 36(b) imposes a fiduciary duty on investment advisers related to the compensation they receive for providing services to mutual funds. 15 U.S.C. § 35(b). It is a breach of this fiduciary duty for an adviser to charge a fund an "excessive fee." *Daily Income Fund, Inc.* v. *Reich & Tang, Inc.*, 464 U.S. 523, 541, 104 S. Ct. 831, 78 L. Ed. 2d 645 (1984). In *Jones* v. *Harris Associates, LP*, 559 U.S. 335, 130 S. Ct. 1418 (2010) (*Jones II*),[15] the Supreme Court resolved a circuit split over the proper standard for evaluating whether an adviser's fee is excessive under § 36(b), articulating the standard as "whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain."[16] The Court held that, for an adviser to face liability under § 36(b), the plaintiff must prove that the fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones II*, 559 U.S. at 345–46. Once it is determined that the board is sufficiently independent and fully informed, "the Act instructs courts to give board approval of an adviser's compensation 'such consideration … as is deemed appropriate under all the circumstances.'" *Id.* at 348 (quoting § 80a-35(b)(2)). The Court listed a non-exclusive number of relevant considerations, known as the *Gartenberg* factors. *See Gartenberg* v. *Merrill Lynch Asset Mgmt, Inc.*, 694 F.2d 923 (2d Cir. 1982).  These factors

---

[15] Three *Jones* cases will be cited in this opinion and their short citation forms will follow the chronological order in which they were decided. Thus, *Jones* v. *Harris Assocs. LP*, No. 4 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007) will be known as *Jones I*; *Jones* v. *Harris Associates, LP*, 559 U.S. 335, 130 S. Ct. 1418, 176 L. Ed. 2d 265 (2010) will be known as *Jones II*; and *Jones* v. *Harris Assocs. LP*, 611 Fed. Appx. 359, 360 (7th Cir. 2015) will be known as *Jones III*.

[16] (Internal quotation marks and italics omitted). The Court drew from *Pepper* v. *Litton*, 308 U.S. 295, 60 S. Ct. 238 (1939).

include the nature and quality of the services provided to the fund; the fees paid by similar funds to their advisers; the cost to the adviser of providing these services and the profitability of the fund to the adviser; the extent to which the adviser realizes economies of scale and whether any savings are passed along to the fund; whether the adviser realizes any "fall-out benefits" from its relationship with the fund; and the "independence, expertise, care, and conscientiousness of the board in evaluating adviser compensation." *See Jones II*, 559 U.S. at 344, n.5.[17]  As the Seventh Circuit summarized it on remand, "[T]he Supreme Court's approach does not allow a court to assess the fairness or reasonableness of advisers' fees; the goal is to identify the outer bounds of arm's length bargaining and not engage in rate regulation." *Jones III*, 611 Fed. Appx. at 360.

## II.    Deference Given to Board Approval

The *Jones II* Court stated that "if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently." *Jones II*, 559 U.S. at 351. This is because the Act was designed to "interpose[ ] disinterested directors as 'independent watchdogs' of the relationship between a mutual fund and its adviser," *id.* at 348 (quoting *Burks* v. *Lasker*, 441 U.S. 471, 482, 99 S. Ct. 1831, 60 L. Ed. 2d 404 (1979)), and it would be "paradoxical for Congress to have been willing to rely largely upon [boards of directors as] 'watchdogs' to protect shareholder interests and yet, where the 'watchdogs' have done precisely that, require that they be totally muzzled[.]" *Id.* at 348–49 (alteration in original) (quoting *Burks*, 441 U.S. at 485). Thus, while "a fee may be excessive even if it was negotiated by a board in possession of all

---

[17] After remand, the Seventh Circuit stated that the first two of these factors "jointly suffice under the Supreme Court's standard." *See Jones III*, 611 Fed. Appx. at 361. The court reasoned that a fee "comparable to that produced by bargaining at other mutual-fund complexes … tells us the bargaining range," while a fund performing "as well as, if not better than, comparable funds" is an indication that the adviser "deliver[s] value for money." *Id.*

relevant information," "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions." *Id.* at 351–52. As such, a court should not "supplant the judgment of disinterested directors apprised of all relevant information, without additional evidence that the fee exceeds the arm's-length range." *Id.* The first phase of review is to "calibrat[e] the degree of deference that should be given to the Board's decision to approve the fees." *Id.* at 351.

Harbor asserts that it is undisputed that the Board (1) was made up of well-qualified individuals with abundant experience; (2) more than met the statutory requirement that 40 percent of the trustees be "disinterested" as that term is defined in the ICA; (3) met numerous times throughout the year to review and approve the IAAs; (4) requested and reviewed materials pertinent to all the *Gartenberg* factors before approving the IAAs; and (5) engaged in negotiation with Harbor over the terms of the IAAs. With this oversight, Harbor argues, the Board is entitled to deference.

Plaintiffs argue that the court should not give deference to the Board's decisions because (1) the Board did not each year actively negotiate the lowest possible fee for the Funds or consider alternate advisers (dkt. 189, at 32.); (2) it was not informed about, and did not request, additional information or retain third-party advisers to analyze the profitability materials it received from Harbor, including the "Modified Profitability Analysis" (*id.*); and (3) the Board was "plagued with conflicts of interest that compromised its ability to serve as an effective check in fee negotiations." (*Id.* at 37.)[18]

---

[18] Plaintiffs additionally argue the court should not give deference to the Board's decision because Harbor has not presented conclusive evidence demonstrating that the Board conducted a thorough review of Harbor's proposed fees. This argument misstates the burden of proof in a § 36(b) action. Plaintiffs have the burden of proving a breach of fiduciary duty under § 35(b). *See* 15 U.S.C. § 80a-35(b)(1). Thus, once Harbor has pointed the court to evidence in the record that the Board

Although there is room to quibble about how little or much individual effort the trustees invested in preparation for their meetings, and whether the fees were the best that could have been negotiated, the court is not persuaded that plaintiffs' evidence is sufficient to create a triable issue of fact under the *Jones* standard.

## A.    Fee Negotiation and Alternate Advisers

While plaintiffs acknowledge that the Board in 2008 negotiated additional breakpoints for HIF to include breakpoints at higher asset levels, they argue that the Board has since been "passive," failing to negotiate further fee reductions or additional breakpoints. Plaintiffs point to no admissible evidence in the record to support an argument that circumstances supported an adjustment of the fee or the addition of breakpoints beyond $72 billion (the highest current breakpoint) such as would indicate lack of loyalty to the Funds. Plaintiffs point to the testimony of Rodger Smith, the lead independent trustee, as evidence that the Board takes "an acquiescent negotiating stance with a modest objective—seeking only to obtain a fee within the range of the Funds' peers—as opposed to negotiating aggressively to secure the lowest possible price." (Pls. Resp. at 35.) If one reads the cited deposition testimony in its entirety, however, it is clear that plaintiffs mischaracterize that testimony. Rather than stating that the Board seeks only a fee comparable to peers, Smith testified that the Board is "trying to get a fee that would be competitive and in line with the expected alpha generation of the fund." (Smith Dep. at 23:24-24:2.)[19] Even if the Board might have driven a harder bargain, the legal standard does not require

---

performed its duties, it is plaintiffs' burden to point to evidence that the review was not sufficiently thorough, rather than Harbor's burden to provide evidence, conclusive or otherwise, that it was.

[19] Additionally, Smith directly addresses and rejects plaintiffs' argument that the Board should view attempting to negotiate the lowest possible fee as the highest good:

Q:    You said earlier that you're not trying to get the lowest fee.
A:    No.

that. Rather, the court is only to look at the range of peer fees to see if Harbor's fees are comparable, which they are.

Plaintiffs also briefly argue that the Board's negotiating process was deficient because it never considered replacing Harbor as the Funds' adviser despite what plaintiffs characterize as "concerns about the quality of the services provided by [Harbor]." (Pls. Resp. at 36.) Plaintiffs argue the Board should have considered changing advisers because (1) one of the Trustees was concerned about the staffing level in Harbor's Investment Portfolio Management team and (2) HIF has underperformed since the 2010 death of Hakan Castegren, a Northern Cross investment manager who worked on the HIF portfolio.

Plaintiffs point to no evidence that this opinion was shared among trustees or evidence indicating that any trustee, including the one raising the understaffing issue, believed the solution would be to remove Harbor as adviser. While plaintiffs may believe that would have been the appropriate response, the court agrees with the court in *Kasilag* v. *Hartford Investment Fin. Servs., LLC*, Nos. 11 C 1083, 14 C 1611, 2016 WL 1394347 (D.N.J. April 7, 2016) (*Kasilag I*), that "[i]n general, a plaintiff should not be able to survive summary judgment through armchair quarterbacking and captious nit-picking," as "[s]uch a standard would put defendants in the untenable posture of defending interminable, manufactured, and protracted litigation involving second-guessing a board's process." *Id.* at *14.

---

Q:      Why is that?
A:      Because the lowest fee would be index fee. That would be a
return with no alpha. That's what Vanguard does. We're not a Vanguard
low-fee market return less expense ratio. We're an alpha-generated firm.

(Smith Dep. at 24:21-25:4.)

As for plaintiffs' second argument that the Board should have considered replacing Harbor because of a decline in HIF's performance, the cited evidence does not support it. Plaintiffs rely on the report of Harbor's expert Russell R. Wermers, Ph.D., to show that HIF has seen a "marked decline in performance in recent years [that] corresponds to Castegren's death in late 2010."[20] (Dkt. 204, Defendant's Response to PSOAF ¶ 12.) And yet, as discussed in more detail below, Wermers found that HIF's performance over the five-year period in question is statistically indistinguishable from that of the index fund that serves as HIF's benchmark. (Dkt. 184-14, Expert Report of Russel R. Wermers, Ph.D. (Wermers Report) ex. 6.) Moreover, plaintiffs do not point to any evidence in the record from which a reasonable trier of fact could conclude there is a causal relationship between Castegren's death and any decline in HIF's performance. Because the court does not have to "draw every conceivable inference from the record—only those inferences that are reasonable" *Bank Leumi*, 928 F.2d at 236—the court finds that plaintiffs have not presented evidence sufficient to give rise to a triable issue of fact as to whether recent underperformance was caused by Castegren's death or is simply a matter of variation in the market or the cyclical nature of investing. *See, e.g.*, *Migdal* v. *Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327–28 (2d Cir. 2001). Thus, plaintiffs have failed to demonstrate that a reasonable trier of fact could conclude that a diligent board would have felt a need to change advisers based on the circumstances it faced.

---

[20] Plaintiffs do not dispute the factual assertions relied on in Wermers's report. Indeed, they rely on the report itself in their Rule 56.1 Statement of Additional Material Facts and their response to the motion for summary judgment. (*See* D. Resp. to Pls. SAMF ¶ 12; Pls. Resp. at 18.) As such, the court will treat the factual assertions contained in the exhibits cited by plaintiffs (Wermers Report, exs. 4–6, 8–9) as undisputed for summary judgment purposes.

### B. Receipt and Analysis of Information Concerning Harbor's Profitability

Plaintiffs argue that the Board "failed to adequately inform itself about key issues bearing on the appropriateness of [Harbor's] fees," namely, the profitability materials Harbor provided for the Board's review, which plaintiffs allege were misleading. The crux of plaintiffs' argument here is that the Board should have agreed with their view of the appropriate way to calculate profitability—what plaintiffs' expert calls the "net profit margin," the calculation of which treats the subadvisory fees paid by Harbor as "contra-revenue" that should not be considered either revenue or a cost to Harbor—and/or hired a third-party adviser to analyze the financial information provided by Harbor consistently with plaintiffs' preferred profitability-calculation method.

The record shows that the Board considered materials reflecting Harbor's profitability both including and excluding the subadvisory fees.[21] (*See* Smith Dep. at 229:23–25 ("[W]e looked at it and said, [']We don't think that this makes sense.['] It's an interesting input but not a starter."); Ball Dep. at 247:9–12 ("[I]t's something we look at but we don't regard it as important as the other two ways of assessing profitability.").) The record further indicates that the Board, after reviewing both profitability calculations, rejected the Modified Profitability Analysis as unhelpful or inappropriate. (*See* Smith Dep. at 237:15–238:2) ("I believe that the work that the subadvisers do is integral to the value that we provide to shareholders …. And it's an important part of the cost function."); Ball Dep. at 249:14–16 ("I'm very convinced that the gross method

---

[21] Plaintiffs additionally quibble with the way Harbor calculated what it called the "Modified Profitability Analysis," but they do not dispute that the Board had all the necessary information, including Harbor's advisory fee, the subadvisory fees, and Harbor's internal operating costs, to calculate Harbor's "net profit margin." Neither do they dispute that the Board received guidance from its legal adviser Dechert that it should "separately evaluate each fee in relation to the services performed by each [subadviser] as well as the 'spread' to be retained by Harbor Capital under a fee schedule in relation to the services performed by Harbor Capital in operating the applicable Fund in the 'manager of managers' structure." (Dkt. 184-34 at HCA0022146.

would be appropriate in these settings."); Colhoun Dep. at 232:5–9 (testifying that treating subadvisory fees as an expense is "the appropriate way").)

Plaintiffs may disagree with the Board's evaluation of the information, but that disagreement does not raise a triable issue of fact regarding the Board's diligence where it is undisputed that plaintiffs' preferred method was considered and rejected. Nor does the Board's failure to hire a third-party adviser in order to advise them regarding a profitability theory they had already rejected, relying on their own extensive experience in the industry, give rise to a reasonable inference that Board process was deficient and, even if it could have been better, certainly not so deficient as to create a triable issue of fact.

C.     Conflicts of Interest

Plaintiffs do not dispute that the make-up of the Board satisfies the ICA's requirement that at least 40 percent of the Board must not be "interested persons" as that term is defined in 15 U.S.C. § 80a-2(a)(19). *See* 15 U.S.C. § 80a-10(a). Rather, plaintiffs argue that conflicts of interest exist because the trustees have a "cozy relationship" with Harbor's management, in particular David Van Hooser, Harbor's CEO and the sole "interested" trustee on the Board. (Pls. Resp. at 37.) Additionally, plaintiffs point to the trustees' "deep and extensive ties with … investment advisory firms like [Harbor]" to argue they are "predisposed to believ[e] that investment advisers like [Harbor] should be rewarded handsomely." (*Id.* at 37–38.)

A conflict of interest is a "real or seeming incompatibility between one's private interests and one's public or fiduciary duties." BLACK'S LAW DICTIONARY 319 (Bryan A. Garner ed., 8th ed. 2004). Plaintiffs point to no evidence in the record from which a reasonable trier of fact could conclude that any trustee's private interests were in conflict with their duty to the Funds'

shareholders. Coziness may indicate willingness to defer to an interested trustee but, without a financial or personal conflict (such as nepotism), it is not a breach of a fiduciary duty.

In sum, plaintiffs have not pointed to admissible evidence to contest the Board's process or independence, nor have they shown that the Board was uninformed or that the review process was tainted by the withholding of necessary information. Therefore, as contemplated by § 36(b)(2), the Board's decisions are entitled to substantial weight. Plaintiffs' disagreement with the Board does not create a genuine issue of material fact as to whether the Board failed in its role as an "independent watchdog[ ]."

### III.    The *Gartenberg* Factors

Because the Board's decision is due substantial deference, it would be inappropriate to supplant the Board's business judgment without additional evidence that the fee is outside the range of fees that could be reached through arm's-length bargaining. Plaintiffs' complaints ultimately boil down to the contention that they would have negotiated lower rates than the Board negotiated. Harbor argues that an evaluation of the *Gartenberg* factors entitles it to summary judgment, while plaintiffs respond that there are genuine disputes of fact as to each of those factors that render summary judgment inappropriate. (As a reminder, the *Gartenberg* factors include (1) the nature and quality of the services provided to the fund, (2) the fees paid by similar funds to their advisers, (3) the cost to the adviser of providing these services and the profitability of the fund to the adviser, (4) the extent to which the adviser realizes economies of scale and whether any savings are passed along to the fund, (5) whether the adviser realizes any "fall-out benefits" from its relationship with the fund, and (6) the "independence, expertise, care,

and conscientiousness of the board in evaluating adviser compensation."[22] *See Jones II*, 559 U.S. at 344, n.5.)

## A. Nature and Quality of the Services Provided to the Funds

### 1. Nature

Harbor contends that it provides "all services necessary to the operation of the Funds other than those discrete services for which the Funds separately pay third-party service providers." (Def. Op. Brief at 26.) Plaintiffs argue that only those advisory services directly performed by Harbor should be considered when determining whether its fees were excessive, and those provided by the subadvisers retained by Harbor should be excluded. (*See* Pls. Resp. at 14–15.)[23]

The court agrees with the reasoning of the court in *Kasilag I*, which concluded that the combined services should be considered against the entire advisory fee. *See* 2016 WL 1394347, *15. As was the case in *Kasilag I*, the IAAs between Harbor and the Funds explicitly permit Harbor to retain subadvisers and contain provisions outlining the scope of Harbor's obligation regarding the compensation and oversight of subadvisers. (2013 HIF IAA ¶¶ 4, 6(b); 2013 HBF IAA ¶¶ 4, 6(b).) As the court in *Kasilag I* noted,

> It would be a strange holding to rule that the nature or quality of
> the services provided by [the adviser] were inferior solely because

---

[22] Because the court has already considered the Board's make-up and review processes, which goes to its "independence, expertise, care, and conscientiousness," as part of the evaluation of the level of deference due its decisions, that evaluation will not be repeated here.

[23] Plaintiffs additionally quibble with Harbor's statement that it "has full responsibility for administrating [*sic*] the affairs of the Trust and each Fund," by pointing out that the Funds pay third-party service providers to provide certain administrative services and arguing this raises a triable issue of fact regarding the services actually provided by Harbor. (Dkt. 189 at 16.) Plaintiffs do not point to any of these services that they claim Harbor was contractually obligated, but failed, to perform for the Funds. In contrast, plaintiffs' own expert testified that the services provided by Harbor "were of the nature specified in the [IAAs], and they were reasonably good quality." (Kopke Dep. at 132:9–11.)

> they were contracted out to [subadvisers], when the parties
> acknowledged this as a possibility in their initial contract. Put
> differently, what's the difference to the Funds if [the adviser]
> perform[s] the services directly or by way of a sub-adviser? The
> sub-adviser clause in the contract seems to indicate that (barring
> rejection of the sub-adviser by the Board) there is no difference.

2016 WL 1394347, at *15. Moreover, the legislative history of § 36(b) suggests that the key

consideration is what services were secured by the fee paid. *See* Sen. Rep. No. 91-1894 (1969),

*reprinted in* 1970 U.S.C.C.A.N. 4897, 4910 ("It is intended that the court look at all the facts in

connection with the determination and receipt of such compensation, including *all services

rendered to the fund* or its shareholders and all compensation and payments received." (emphasis

added)). But for the agreement between the Funds and Harbor, the performance of services

provided to the Funds by the subadvisers would not have been secured. This court agrees that

"[d]isregarding those services solely because [the adviser] made the permissible business

decision that they were better or more efficiently (or even more inexpensively) performed by

[subadvisers] is non-sensical." *Kasilag I*, 2016 WL 1394347, at *15.

### 2.    Quality

In evaluating the quality of the services provided to funds, other courts have compared

the performance of challenged funds against peer funds. *See, e.g.*, *Jones* v. *Harris Assocs. LP*,

No. 4 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007) (*Jones I*), *aff'd by Jones III*, 611 Fed.

Appx. 359; *Kasilag* v. *Hartford Inv. Fin. Servs.*, Nos. 11 C 1083, 14 C 1611, 15 C 1876, 2017

WL 773880 (D. N.J. Feb. 28, 2017) (*Kasilag II*); *Krinsk* v. *Fund Asset Mgmt, Inc.*, 875 F.2d 404

(2d Cir. 1989). A fund performing "as well as, if not better than, comparable funds" is an

indication that the adviser "deliver[s] value for money." *Jones III*, 611 Fed. Appx. at 361.

Harbor argues that the Funds have performed at least as well as comparable funds. (Def.

Op. Brief at 28–29.) Specifically, Harbor points out that HIF has exceeded its benchmark over

the last 10-year and 25-year periods, by 4.43% and 5.34% net of fees, respectively (*id.* at 28),

and that HBF has an "intentionally conservative investment strategy" that, while leading to a

slight underperformance of its benchmark, made it a steady performer that performed well

compared to peer funds, even during financial downturns like that of 2007–08 (*id.* at 29).

Plaintiffs respond that (1) Harbor should not get "credit" for performance that is the result of the

work of the subadvisers, (2) evaluation of the Funds' performance should be limited to their

performance during the damages period (February 2013 to the present), and (3) HIF has

performed worse than comparable funds during that time period. (Pls. Resp. at 17–19.)[24]

Plaintiffs do not, however, respond to Harbor's argument regarding HBF's performance in light

of its conservative investment strategy or point to evidence that HBF has not performed as well

as or better than comparable funds. As such, they have forfeited any argument regarding HBF's

underperformance. *See Roe-Midgett* v. *CC Servs., Inc.*, 512 F.3d 865, 876 (7th Cir. 2008)

(holding that undeveloped argument constitutes waiver); *Palmer* v. *Marion County*, 327 F.3d

588, 597–98 (7th Cir. 2003) (holding that claims not addressed in a summary judgment

opposition brief are abandoned).

   Plaintiffs' argument that Harbor should not get "credit" for the subadvisers' work is

unavailing for the reasons discussed in the previous section. In evaluating quality, as illustrated

by the performance of the funds, courts are instructed to consider "all services rendered to the

fund or its shareholders." Sen. Rep. No. 91-1894 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897,

4910. That Harbor engaged subadvisers who rendered quality services to the Funds and its

---

[24] Plaintiffs argue that HIF has suffered a recent decline in performance as a result of the death of
one of HIF's long-time portfolio managers, Hakan Castegren, in 2010. (Pls. Resp. at 17–19.) As discussed
above, plaintiffs do not point to any evidence in the record from which a reasonable jury could conclude
there is a *causal* relationship between Castegren's death and any subsequent decline in HIF's
performance. *See*, *supra*, section II.

shareholders, including plaintiffs, does not suggest that Harbor deserves no credit. Plaintiffs'

argument that the Funds' performance should be limited to their performance during the

damages period is also unpersuasive. Evaluation of performance as it relates to the adviser's

compensation will always be a retrospective inquiry, in that the court must look to the

information the Board had at the time it approved the challenged compensation. When the Board

approved the IAA in 2013, it did not know how the Funds would perform that year; rather, it

would have looked at past performance. *See Jones I*, 2007 WL 627640, at *9, *aff'd by Jones III*,

611 Fed. Appx. 359 ("[H]ow the Funds performed after the damages period is not relevant to the

quality of services rendered before that time.") Notwithstanding that plaintiffs' argument runs

counter to persuasive authority in this district, plaintiffs additionally fail to cite to any pertinent

authority in support of their argument or explain how their prospective approach is practicable.

Plaintiffs do not dispute that HIF "has been the best performing international equity fund among

its peers, net of fees" over the 25-year period ending December 31, 2014. (Pls. Resp. to D. SMF

¶44(b).) Looking at more recent results, plaintiffs do not dispute that HIF outperformed its

benchmark by 2.92% for the ten-year period ending December 31, 2014. Nor do they dispute that

HIF outperformed its benchmark by 1.90% for the ten-year period ending December 31, 2015,

and it performed better than 26 of 34 funds in its peer group over that same time period.[25]

Finally, even limiting review to plaintiffs' preferred five-year period ending December 31, 2015,

plaintiffs do not dispute that, while HIF underperformed its benchmark by 0.09%, this

underperformance was statistically indistinguishable from the benchmark performance, and that

HIF outperformed 12 of 40 funds in its peer group during the period. As such, plaintiffs have

---

[25] These numbers come from the report of Harbor's expert, Dr. Russel Wermers. (Wermers Report, exs. 5, 8.) See, *supra*, n.19 for discussion on why they are accepted as undisputed.

failed to point to evidence from which a reasonable jury could conclude that the Funds have not performed at least as well as, if not better than, comparable funds.

## B. Comparability of Harbor's Fee to Those Paid by Other Similar Funds

The fees paid by other mutual funds "tell[ ] us the bargaining range" produced by arms-length bargaining in the market. *Jones III*, 611 Fed. Appx. at 361. Harbor points to reports by two independent industry analysts, Lipper and Morningstar, which indicate that Harbor's fees fall within the range of fees paid by similar funds to their investment advisers. (Def. Op. Brief at 22–26.) Plaintiffs argue that (1) one of the fee comparisons—the "total expense ratio"—provided by Lipper is improper; (2) the sample sizes in the Lipper Expense Groups, which Lipper chooses according to its own methodology to contain firms that are comparable to the target funds, *i.e.*, HIF and HBF, are too small; (3) Harbor limited the Expense Groups to "small[,] expensive funds"; (4) Harbor manipulated the Lipper materials, presumably to its advantage; and (5) the challenged fees exceed averages from a Morningstar study. (Pls. Resp. at 25–29.) Other than the Morningstar study, plaintiffs do not point to evidence in the record indicating that Harbor's fees are higher than those of comparable firms.

Plaintiffs' first argument is well-taken. Total expense ratio is a measure of the total cost of a fund to the investor and is calculated by dividing the total annual cost by the fund's total average assets over the year. The ratio takes into account fees that are not part of the advisory fee, such as transfer agent fees, and thus may not provide a clear picture of what the actual bargaining range is for advisory fees alone. As such, defendants cannot show the fees they charge are comparable to the fees charged by other advisers based on the total expense ratios of the comparable funds. Because, however, the Lipper analysis is not limited to total expense ratios but also include comparisons of just the advisory fees paid by similar funds, plaintiffs

cannot avoid summary judgment simply by pointing out the inapplicability of total expense ratios to a proper evaluation.

With regard to the size of the Lipper Expense Groups, which are made up of a relatively small number of funds[26] that Lipper has determined are comparable to the Funds, plaintiffs point to no case law mandating larger data sets and, in fact, the Seventh Circuit has affirmed a district court's finding that sample sizes of 10 or 11 peer funds is sufficient for a finding of comparable fees. *See Jones I*, 2007 WL 627640, at *8, *aff'd* by *Jones III*, 611 Fed. Appx. 359. Moreover, Lipper states in its methodology section that "expense group[s] will typically consist of seven to 20 funds … [and] a group of this size provides a valid expense comparison for funds in any Lipper investment classification/objective." (Dkt. 166-83 at HCA0022920.) This is because "[Lipper's] intent is to select only funds considered to be the best fit relative to a subject fund [and] [v]ery large expense groups (*e.g.*, 25-30 funds) are typically not feasible while staying within the parameters of [its] stated methodology." (*Id.*) Plaintiffs have submitted no contrary evidence that a larger sample size is either needed or more accurate.

As for plaintiffs' third argument, they fail to point to any evidence that HIF's Expense Group was artificially constructed by Harbor to exclude similar funds with more assets under management than HIF. To the contrary, plaintiffs admit that Lipper followed its methodology, which takes into account asset size of comparative funds (*see id.* at HCA0022921) but, "[g]iven Lipper's peer selection criteria, there are no comparable funds larger than the [HIF]." (Pls. Resp. at 28 (quoting dkt. 166-83 at HCA0022921) (second alteration in original).)[27] Again plaintiffs

---

[26] HIF's 2014 Expense Group contained 16 funds, while HHYBF's 2014 Expense Group contained 20 funds. (PSOF ¶ 46.)

[27] Additionally, Lipper's analysis includes two metrics to allow for apples-to-apples comparisons of the advisory fees of different sizes of funds: (1) comparison of fees at different asset levels and (2)

offer no contrary evidence indicating that the peer selection criteria created a "misconception that the Funds' fees may be low" by "limiting the peer groups to small[,] expensive funds." As such, their speculation is insufficient to avoid summary judgment.

Plaintiffs next argue that Harbor manipulated the Lipper materials by requesting that Lipper compare HIF to both International Large-Cap Core Funds (ILCC) and International Large-Cap Growth Funds (ILCG) despite Lipper's classifying HIF as an ILCG fund. They imply that this was intended to make Harbor's fees appear more competitive.[28] Plaintiffs do not dispute, notwithstanding the arguments rejected above, that it would be appropriate to compare HIF to the ILCG funds as per Lipper's methodology. But of the 11 ILCG funds in HIF's expense group in 2014, none charged a lower actual management fee than did Harbor. (*See* Dkt. 166-84 at HCA0016185.) As such, the undisputed facts establish that Harbor charged fees that fall within (or, more accurately, below) the range of fees paid by similar funds.

As a final matter, plaintiffs point to a Morningstar study from 2014 that they claim shows that Harbor charged higher fees to HIF[29] than comparable firms which, if contrasted with the Lipper data cited by Harbor, could create an issue for the trier of fact to resolve. As plaintiffs themselves point out, however, courts "must be wary of inapt [fee] comparisons," (Pls. Resp. at 28 (quoting *Jones II*, 559 U.S. at 350) (alteration in original)). The 54 bps fee cited by plaintiffs

---

comparison of fees at a common asset level, wherein Lipper determines what each fund would pay its adviser if its assets were the same as HIF.

[28] Plaintiffs additionally argue that Harbor "directed Lipper to suspend its methodology" (Pls. Resp. at 27) in order to compare both Funds to Institutional and Retail No-Load funds, despite Lipper's general practice of comparing institutional funds only with other institutional funds. Lipper, however, classified both HIF and HBF as retail funds and, as such, it does not appear that Lipper would have been "suspending" or otherwise contravening its methodology by agreeing to compare those funds with fund-types other than "retail."

[29] Plaintiffs make no argument that this study is evidence that HBF was charged too high a fee. As such, the court considers any such argument forfeited.

is a total expense ratio, which plaintiffs recognize as an inappropriate measure in a § 36(b) fee comparison because it includes fees beyond the advisory fee.[30] As such, this study does not raise an issue of triable fact.

In short, no reasonable trier of fact, viewing the undisputed facts in the light most favorable to plaintiffs, could find that Harbor's fees fall outside the range of fees paid by comparable funds.

### C.    Cost to Harbor of Providing Services; Profitability of the Funds to Harbor

Harbor argues that its pre-tax profit margins on the Funds of 37.6% (HIF, 2014) and 38.5% (HBF, 2014) are in line with the profit margins earned by other investment advisers in the mutual fund industry. Plaintiffs' response is that Harbor should treat the fees it pays to the subadvisers as pass-through payments that are not included in Harbor's expenses.[31] Without the subadvisory fee, according to plaintiffs, Harbor's profit margins on the Funds are 89–90%[32] which, they argue, renders the advisory fee excessive. In support of this theory, plaintiffs point to testimony by two of their experts as well as recent SEC guidance on another section of the Act,

---

[30] The 54 bps number is additionally not the only (or even best) comparison in the Morningstar study. The 54 bps number is the average expense ratio of no-load share classes across the mutual fund industry, from passively- to actively-managed funds and including both U.S. and international funds. The study also includes average fees comparing those subcategories. Specifically, the study shows that the average expense ratio for a U.S. equity fund is 58 bps, while for an international equity fund it is 77 bps. It also shows that passive funds had a 20 bps expense ratio, while active funds averaged 79 bps. HIF is an actively-managed International fund. In 2014 its total expense ratio was 72.9 bps. Thus, even were total expense ratios to be accepted, and even viewing the facts in the light most favorable to plaintiffs, no reasonable trier of fact could, based on this study, find that HIF's fee fell outside the range of fees paid by comparable funds.

[31] Plaintiffs do not appear to contend that a profit margin of 37%–38% would be excessive in its own right.

[32] Harbor's Modified Profitability Analysis reported profit margins in the range of 78–80%. The difference appears to depend on whether internal compensation is included (as plaintiffs advocate) or excluded.

two (rather outdated) consent orders, and portions of the memorandum Dechert provides to the Funds' Board containing legal advice regarding the 15(c) review process.

Plaintiffs do not dispute that the subadvisers provide their services pursuant to contracts between Harbor and the subadvisers, nor do they dispute that the Funds are not required by the IAAs to pay any fees directly to the subadvisers for those services. Likewise, plaintiffs do not dispute that the inclusion of the subadviser fees in Harbor's expenses is consistent with generally accepted accounting practices (GAAP) for financial accounting. Rather, plaintiffs argue that (1) mutual fund profitability reporting is not required to comply with GAAP, and "management accounting," which seeks to provide information that facilitates business decision-making, militates in favor of using their "net-profitability" metric (Pls. Resp. at 21–22); and (2) including the subadvisory fees ignores "the economic and practical realities" that the fees were for services provided to the Funds by the subadvisers and Harbor was contractually able to collect its own advisory fee from the Funds each month before it was obligated to pay the subadvisers their fees. (*Id.* at 22.)

Plaintiffs point to no case law holding that profitability should be reported in the manner they advocate.[33] In fact, the only cases directly on point have rejected plaintiffs' theory on

---

[33] The rulings plaintiffs do marshal are inapplicable. First, plaintiffs claim support from a January 2016 guidance from the SEC. (Pls. Resp. at 12 (citing Thoreau Bartmann, et al., SEC, IM Guidance Update, *Mutual Fund Distribution and Sub-Accounting Fees*, at 4, 8 (Jan. 2016) *available at* https://www.sec.gov/investment/im-guidance-2016-01.pdf).) Unlike the fees at issue, the cited guidance deals with distribution fees, which are separately regulated by rule 12b-1 under the ICA and which must be treated separately from non-distribution related servicing fees. There is no analogous rule regarding subadvisory fees that would make the guidance relevant in this context. Plaintiffs also rely on *Krinsk* v. *Fund Asset Mgmt., Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), cited for the testimony by defendants' expert Russell Peppet. They argue that Peppet's testimony contradicts his opinion here that subadvisory fees should be included as revenue for Harbor. The case and testimony, however, also deals, in pertinent part, with 12b-1 distribution fees and is inapplicable here.

Plaintiffs additionally rely on *SEC* v. *Am. Birthright Trust Mgmt. Co.*, No 80 C 9266, 1980 WL 1479 (D. D.C. Dec. 30, 1980), and *In re Smith Barney Fund Mgmt. LLC*, SEC Rel. No. 51761, 2005 WL

profitability reporting. *See Kasilag II*, 2017 WL 773880, at *22 ("Consistent with the Court's consideration of the services provided by [the subadviser] in considering the 'nature of services' provided, the Court considers profitability inclusive of [the subadviser's] fees."); *Sivolella* v. *AXA Equitable Life Ins. Co.*, No. 11 C 4194, 2016 WL 4487857, at *50–51 (D. N.J. Aug. 25, 2016) ("The Court finds that reporting sub-adviser and sub-administrator fees as expenses is within ordinary accounting principles."). Harbor responds by pointing to the legislative history of § 36(b), which instructs courts to "look at … all services rendered to the fund or its shareholders and all compensation and payments received," Sen. Rep. No. 91-1894 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4910, as well as case law applying that principle. *See, e.g.*, *Benak* v. *Alliance Capital Mgmt. L.P.*, No 1 C 5734, 2004 WL 1459249, at *8 (D. N.J. Feb. 9, 2004) ("[U]nder § 36(b) it is the overall nature and quality of the services provided by the investment adviser that is at issue—not merely some small percentage of those services."); *see also Gartenberg*, 694 F.3d at 931 ("To limit consideration to the Manager's own administrative expenses would be to exalt form over substance and disregard the expressed Congressional intent that all the facts in connection with the determination and receipt of such compensation be considered." (internal quotation marks omitted)).

Moreover, plaintiffs do not dispute that the Board received materials reflecting Harbor's profitability both with and without the subadvisor fees. Additionally, as plaintiffs note, the Board received a memorandum from Dechert advising the Board to consider "each fee in relation to the

---

1278368 (May 31, 2005), to support their theory that subadvisory fees should not be included in profitability analyses. Neither of these cases holds as such, and both are distinguishable. In both cases the advisors whose fees were being challenged withheld from the mutual fund's board important information regarding the relationship between adviser and subadviser, including, in the case of *Am. Birthright*, the existence of a subadviser. The holdings of these cases centered on these misrepresentations or omissions, and the language plaintiffs point to regarding the excessiveness of the advisory fees in relation to the subadvisory fees is little more than dicta, which the court does not find persuasive.

services performed by each, as well as the 'spread' to be retained by [Harbor] under a fee schedule in relation to the services performed by [Harbor] in operating the applicable Fund in the 'manager of managers' structure." (Pl. Resp. at 12.)

There is evidence in the record that the Board considered both profitability metrics and rejected plaintiff's preferred method as unhelpful or inappropriate. (*See* Smith Dep. at 229:23–25, 237:15–238:2 ("[W]e looked at it and said, [w]e don't think that this makes sense. It's an interesting input but not a starter. . . .  I believe that the work that the subadvisers do is integral to the value that we provide to shareholders. . . . And it's an important part of the cost function."); Ball Dep. at 247:9–12, 248:14–249:16 ("[I]t's something we look at but we don't regard it as important as the other two ways of assessing profitability, … the Emerging Issues Task Force, … they're like sort of a rapid-reaction force in accounting…. Its meetings are all attended by the chief accountant, the deputy chief accountant of the SEC … [s]o I view this as being signed off by both the accounting profession and the SEC as the governing authority. And it says that in these – as I understand the criteria and their application, I'm very convinced that the gross method would be appropriate in these settings."); Colhoun Dep. at 232:5–9 (testifying that treating subadvisory fees as an expense is "the appropriate way").) As such, because plaintiffs cannot dispute that the Board considered Harbor's profitability including and excluding subadviser fees, they are left to argue that there is a genuine dispute as to how profitability should be calculated based on their own experts who disagree with the way the Board weighed the profitability factor.

This argument is inconsistent with the Supreme Court and Seventh Circuit opinions in *Jones*. *See Jones II*, 559 U.S. at 351–52 ("[T]he standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions[,]" "even if a court might

weigh the [*Gartenberg*] factors differently."); *Jones III*, 611 Fed. Appx. at 360 ("[T]he Supreme

Court's approach does not allow a court to assess the fairness or reasonableness of advisers' fees;

the goal is to identify the outer bounds of arm's length bargaining and not engage in rate

regulation."). Indeed, the Supreme Court specifically admonished courts not to "supplant the

judgment of disinterested directors apprised of all relevant information, without *additional*

evidence that the fee exceeds the arm's-length range." *Jones II*, 559 U.S. at 351–52. Plaintiffs do

not point to any such additional evidence, such as information withheld from or misrepresented

to the Board.[34] As such, plaintiffs' Monday-morning quarterbacking of the Board's weighing of

Harbor's profitability does not create a triable issue of fact on this factor.

### D.  Economies of Scale and Fall-Out Benefits Realized by Harbor

#### 1.  Economies of Scale

An economy of scale is defined as a "decline in a product's per-unit production cost

resulting from increased output, usu[ally] due to increased production facilities; savings resulting

from the greater efficiency of large-scale processes." BLACK'S LAW DICTIONARY 553 (Bryan A.

Garner et al. eds., 8th ed. 2004). The "output" for a mutual fund is the value of assets under

management. *See Sivolella*, 2016 WL 4487857, at *56. As assets under management increase,

the cost of managing the fund may also increase, but cost is unlikely to increase as fast as the

assets under management increase, meaning the cost per-unit goes down. Section 36(b) requires

that any realized economies of scale be shared equitably with the Fund. *See* Sen. Rep. No. 91-

1894 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901 ("[T]his bill recognizes that investors

---

[34] Plaintiffs argue that Harbor withheld information regarding the profitability of each Fund to Harbor excluding subadviser fees (Pls. Resp. at 24; D. Resp. to Pls. SAMF ¶ 24) but, as was the case with plaintiffs' complaints regarding Harbor's Modified Profitability Analysis in general, they do not, and cannot, dispute that the Board had all the information (such as Harbor's advisory fees and costs, including the subadvisory fee, for each Fund) necessary to perform these calculations without difficulty.

should share equitably … in the economies available ….") The plaintiff bears the "burden of proving the cost of performing Fund transactions decreased as the number of transactions increased." *Krinsk*, 875 F.2d at 411.

Harbor argues that plaintiffs have pointed to "no evidence that the total per-unit cost of servicing the Funds declined as the Funds grew in size" and, therefore, have failed to carry their burden of proof on the issue of whether economies of scale exist. Harbor additionally argues that contractual breakpoints and annual fee waivers, which undisputedly reduced Harbor's 2014 advisory rate more than 10 bps, are adequate to share any economies of scale realized.

In response, plaintiffs point to their expert, who believes that economies of scale should be evaluated by looking only at Harbor's internal operating expenses and, when evaluated that way, Harbor realized "significant" economies of scale and failed to share them with investors. They next turn to Harbor's argument that fee reductions accomplished by the breakpoints and fee waivers adequately shared any economies of scale Harbor realized, and argue that there are disputed facts about the reductions themselves. Specifically, plaintiffs argue that there is a dispute (1) as to who "funded" the reductions because a portion of the fee reduction was the result of a subadviser reducing its fees; (2) whether the reductions actually occurred because the effective fee in 2014 (64.9 bps) is higher than the contractual fee of 57 bps for assets over $48 billion; (3) whether the reductions adequately share economies of scale realized because the effective fee in 2014 (64.9 bps) is higher than the industry average for all institutional funds (54 bps); and (4) between 2012 and 2015, the total fee HIF paid to Harbor equaled approximately $1.1 billion despite what plaintiffs characterize as poor performance by HIF during this period.[35]

---

[35] Plaintiffs additionally appear to argue that the $1 billion in fees illustrates that there was inadequate sharing of economies of scale because Harbor "basically only need[ed] one person to service"

33

In addition to being highly cursory in nature, none of these arguments gives rise to a triable issue of fact over whether economies of scale existed or whether they were adequately shared.

As an initial matter, plaintiffs' argument that there is a triable issue of fact as to whether the reductions in Harbor's fee actually occurred appears to arise out of a misunderstanding of how the breakpoints and fee waivers work. Plaintiffs appear to believe that after a breakpoint level is reached, the fee for all assets under management is equal to that listed for that particular breakpoint. The plain language of the IAA, however, makes clear that the breakpoints are marginal reductions. When this is understood, it becomes clear that the 2014 effective fee is exactly what would be expected after application of the breakpoints and fee waivers.[36]

None of plaintiffs' other arguments regarding the fee reduction raises a triable issue of fact. First, plaintiffs fail to explain why they believe the dispute over who "funded" the reductions, which does not appear to actually be disputed, indicates that economies of scale were not shared. Possibly this is because Harbor's passing on a reduction in fee implemented by the subadviser to the Funds (a reduction in the cost to Harbor of managing the Funds as assets increase) appears to be an example of a shared economy of scale. Plaintiffs do not, for example, point to evidence that the subadviser reduced its fee by 2bps and Harbor only passed along 1bps, which might raise a triable issue of fact regarding whether adequate sharing was occurring. In fact, when plaintiffs state that "some portion of [the fee reduction] was funded by the subadviser

_____

HIF. The record citations following that statement, however, do not support it. Therefore, the court does not consider that portion of plaintiffs' argument.

[36] Assuming exactly $50 billion in assets under management, the expected fee would be ($12,000,000,000 x 0.0075) + ($12,000,000,000 x 0.0065) + ($12,000,000,000 x 0.0063) + ($12,000,000,000 x 0.0058) + ($2,000,000,000 x 0.0057) = $324,600,000. $324,600,000/$50,000,000,000 = 0.00649 or 64.9 bps.

reducing its fees," they indicate that Harbor recognized and shared economies of scale in addition to those realized by the subadviser. (Pls. Resp. at 30.)

Next, as discussed in greater detail in the section on comparable fees, the Morningstar study cited by plaintiffs to show that other institutional funds are charged lower rates by their advisers does not support their argument that there is a triable issue of fact over whether Harbor recognized additional economies of scale. While evidence that other advisers provide similar services while charging significantly lower fees might give rise to an inference that economies of scale exist, for such a comparison to work, the fees being compared must be charged by advisers providing similar services. The average industry rate cited by plaintiffs, because it takes into account both actively and passively managed funds, is not illustrative of the fee being paid for similar services. Finally, plaintiffs point to no evidence from which a reasonable jury could conclude that the Funds' performance affected the cost to Harbor of managing them. Therefore, the fact that Harbor received more than $1 billion in fees from 2012 to 2015 is immaterial to the question of whether economies of scale were adequately shared.[37]

Because plaintiffs have failed to raise any triable issues of fact regarding economies of scale, summary judgment on this factor is appropriate.

### 2. Fall-out Benefits

Fall-out benefits are "collateral benefits that accrue to the adviser because of its relationship with the mutual fund." *Jones II*, 559 U.S. at 344. Harbor states that plaintiffs have made no allegations regarding fall-out benefits. (*See* Def. Op. Brief at 15 n.9.) Plaintiffs respond that Harbor accrues fall-out benefits in the form of fees paid to Harbor's wholly owned

---

[37] As was discussed above, the level of performance is disputed by the parties, but resolution of that question would not affect the analysis of this argument. Thus the court will assume it true for the purposes of this portion of the motion for summary judgment.

subsidiaries, Harbor Funds Distributors, Inc. and Harbor Services Group, Inc., to secure distribution and transfer agent services for the Funds. (Pls. Resp. at 31.) What plaintiffs do not do is point to any evidence or make any argument for why these fees, which were known to and approved annually by, the Board, and paid directly by the Funds, militate towards a finding that the advisory fee charged by Harbor is excessive. Plaintiffs make only the conclusory statement that "there are triable issues regarding fall-out benefits" (*id.*) without offering any explanation for why, "[i]f these benefits were taken into consideration …, they would constitute a very substantial offset calling for a lower fee to [Harbor] than that paid by the Fund[s]." *Gartenberg*, 694 F.2d at 932. As such, the court concludes that plaintiffs have failed to raise a triable issue of fact as to this factor.

## CONCLUSION AND ORDER

*Jones III* states that an adviser's satisfaction of two of the *Gartenberg* factors, comparability to peer fees and performance, suffices under the Supreme Court's standard to justify the adviser's fees. *See Jones III*, 611 Fed. Appx. at 361. Because the case is not precedential, this court has examined all the factors; yet, plaintiffs have failed to demonstrate a genuine issue of fact requiring trial under any of them. As a result, Harbor is entitled to judgment as a matter of law. The court, therefore, orders as follows:

Harbor's motion for summary judgment (dkt. 162) is granted. Harbor's motions to bar expert testimony by plaintiffs' experts (dkts. 230, 232) are moot. The Clerk is directed to enter judgment in favor of defendant. The case is terminated.

Date: March 13, 2018

_____
U.S. District Judge